GREENBERG FREEMAN LLP
Michael A. Freeman
110 E. 59th Street, Fl. 22
New York, New York 10022
(212) 838-3121
freeman@greenbergfreeman.com
*Counsel for the Plaintiffs*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
IN RE:

PETR RAZIYEV,

    Debtor.

------------------------------------------------------------x

GREGORY KATS; and ALEXANDER TSINIS
and DIANA TSINIS, as Co-Administrators
of the Estate of Eduard Tsinis, individually
and derivatively on behalf of M&P FOOD
PRODUCTIONS, LTD.,

    Plaintiffs,

    -against-

PETR RAZIYEV,

    Defendant.

    -and-

M&P FOOD PRODUCTIONS, LTD.,

    Nominal Defendant.

------------------------------------------------------------x

Chapter 7

Bankr. Case No. 1-23-44424 (nhl)

Adv. Proc. No.

## COMPLAINT OBJECTING TO THE DISCHARGEABILITY OF
## DEBTS DUE AND OWING BY DEFENDANT TO PLAINTIFFS

    Plaintiffs Gregory Kats ("Kats") and Alexander Tsinis and Diana Tsinis, in their capacity as the co-administrators of the estate Eduard Tsinis ("Estate of Tsinis" and, collectively, "Plaintiffs"), by their undersigned counsel, suing both individually and derivatively on behalf of

M&P Food Productions, Ltd. ("M&P" or the "Corporation"), object to the dischargeability of debts due and owing by defendant Petr Raziyev ("Defendant") to Plaintiffs, and allege as follows:

## JURISDICTION, VENUE, AND STATUTORY PREDICATES FOR RELIEF

1. This adversary proceeding arises out of the bankruptcy case of Defendant, Bankruptcy Case No. 1-23-44424 (nhl). This Court has jurisdiction over this Chapter 7 case and this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2. Venue of this adversary proceeding lies in this District pursuant to 28 U.S.C. § 1409.

3. The statutory predicates for the relief requested herein are Bankruptcy Code §§ 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6) and Bankruptcy Rule 7001(6).

## THE PARTIES

4. Plaintiff Kats is a citizen and resident of the State of New York, County of Queens.

5. Plaintiffs Alexander Tsinis and Diana Tsinis are the duly appointed co-administrators of the Estate of Tsinis pursuant to Limited Letters of Administration issued by the Queens County Surrogate on or about September 21, 2021. The late Eduard Tsinis ("Tsinis") died a resident of Queens, New York on April 17, 2021.

6. Upon information and belief, Defendant Raziyev is a citizen and resident of the State of New York, County of Queens, with a residential address of 5822 262nd Street, Little Neck, New York.

7. Derivative plaintiff and nominal defendant M&P is a corporation organized under the laws of New York with its principal place of business at 830 39th Street, Brooklyn, New York.

## PROCEDURAL HISTORY

8. On November 30, 2023, Defendant filed with this Court a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

9. No proof of claim deadline has been set, but Defendant's voluntary bankruptcy petition lists both Plaintiffs as nonpriority creditors, each with an unsecured claim that Defendant has self-valued at $500,000 each.

## FACTUAL BACKGROUND

### The Purchase of M&P

10. Kats and Tsinis met in the early 1990s and became friends as well as partners in several businesses in the retail and wholesale food industry.

11. Kats and Tsinis met Defendant in the late 1990s, after Defendant emigrated to the United States and began working for Kats and Tsinis.

12. In 2003, while employed as a truck driver of one of the businesses owned by Kats and Tsinis, Defendant learned that M&P, a manufacturer and distributor of Russian dumplings and other Russian food products located in Brooklyn, was for sale.

13. The owner's asking price for the business was $320,000.

14. Defendant, however, had neither sufficient capital to purchase the business, nor the ability to raise sufficient capital through ordinary lending channels.

15. For this reason, Defendant invited Kats and Tsinis to become investors in M&P.

16. Thereafter, the parties orally agreed that Defendant, Kats and Tsinis would purchase M&P together and become joint owners of M&P.

17. The parties orally agreed that Defendant would contribute $160,000 towards the purchase price and that Kats and Tsinis would jointly contribute the other $160,000.

18. The parties further agreed that, although they were investing equal amounts, Defendant would own 51% of the Corporation because he was going to be responsible for the day-to-day operation of the business, and that Katz and Tsinis, who intended only be involved in the business part-time, would jointly own the remaining 49% of the Corporation, divided equally between the two of them.

19. On or about December 4, 2003, Defendant, Kats and Tsinis jointly acquired M&P.

20. After M&P was acquired, Defendant assumed the office and title of president, a position that he continues to hold to this day.

21. After the parties purchased M&P, Defendant also appointed himself as the sole member of M&P's board of directors.

22. Since Defendant would be operating the day-to-day business and Kats and Tsinis trusted him to act in the best interest of all shareholders, Kats and Tsinis acquiesced to Defendant appointing himself as president and the sole director of M&P.

**The Early Operation of M&P**

23. Following the purchase of M&P, Defendant immediately took control of the company's operations, which included managing dumpling production and maintaining the facilities and equipment.

24. Defendant also hired his wife Vera Raziyeva ("Vera") to serve as the fulltime bookkeeper for M&P and to handle its internal finances and accounting.

25. At the time of purchase, Kats and Tsinis intended to be involved primarily in sales, which they did not expect would require their day-to-day involvement in the business.

26. Since Defendant and his wife Vera were both going to be working fulltime at M&P, all parties agreed that Defendant and Vera should receive a salary from the Corporation.

4

27. It was agreed that Defendant and his wife Vera should receive a biweekly salary of $750 each, which all parties agreed was fair.

28. Other than this initial agreement on salaries for Defendant and Vera, the parties never had any further discussion about salaries or other compensation and benefits for Defendant or Vera.

29. During the first few years of operation, M&P upgraded its equipment and improved the quality and taste of the products being sold.

30. M&P also developed a new logo and packaging as a way for M&P to disassociate itself with the former, lower-quality food products that were being sold.

31. With the improved product and new packaging, Kats and Tsinis solicited new potential customers, many who were already vendors and customers of Kats and Tsinis's other businesses, to purchase M&P's products.

32. By 2005, M&P was generating enough revenue to start distributing dividends to the shareholders.

33. The dividend payments that Kats and Tsinis received at this time were typically around $1000 each.

34. During this period, Kats and Tsinis rarely, if ever, reviewed the Corporation's books and records to determine whether the dividends they received represented a proportionate share of M&P's profits, but relied upon and trusted Defendant to distribute profits in accordance with each owner's interest.

35. The dividend payments that Kats and Tsinis received were distributed by a corporate check that was handwritten and signed by Vera on behalf of the Corporation.

36. In many instances, Vera wrote the word "dividends" on the memo line of the dividend checks distributed to Kats and Tsinis.

### The First Buy-Out Request

37. By the end of 2011, Kats and Tsinis had very little involvement in the business and decided to ask Defendant if he was interested acquiring their 49% interest in the Corporation.

38. In or around December 2011, Kats and Tsinis met with a lawyer, who wrote a letter to Defendant on their behalf, which included a request for Defendant to buy-out them out and to provide Kats and Tsinis with various books and records of the Corporation so that they could determine the fair value of their interest.

39. Defendant failed and refused to provide Kats and Tsinis with the requested books and records of M&P and never formally responded to their request for a buy-out.

### The Reduction in Dividend Payments

40. In or around May 2015, M&P and Defendant were sued by an M&P employee for a violation of the Fair Labor Standards Act ("FLSA").

41. Shortly after the lawsuit commenced, instead of receiving their typical $1000 per month dividend payment, Kats and Tsinis received a reduced payment of $500.

42. When Kats and Tsinis asked why their dividend payments had decreased, Defendant and Vera told him that M&P did not have enough money to pay Kats and Tsinis $1000 each because they had to hire a lawyer to represent M&P and Defendant in the FLSA Action,.

43. Defendant assured Kats and Tsinis, however, that when business improved and M&P no longer had extra expenses associated with the FLSA lawsuit, M&P would increase the dividend payments to Kats and Tsinis.

44. By mid-2016, however, although the FLSA Action had already been settled, the amount of the dividend payments to Kats and Tsinis did not increase.

45. When Kats and Tsinis asked Defendant why their dividend payments had not increased after the FLSA lawsuit was resolved, Defendant told them that M&P's business was still not good enough money to increase dividend payments.

46. By mid-2017, Defendant still had not increased the dividend payment to Kats and Tsinis back to its pre-2015 level, even though it appeared to them that M&P was selling more product than ever before.

47. As a result, Kats once asked Defendant and Vera when he and Tsinis could expect increased dividend payments.

48. Kats also requested that Defendant and/or Vera allow him to inspect M&P's books and records to see how the Corporation was doing.

49. Defendant and Vera deflected these inquiries and refused to provide Kats or Tsinis with any financial information about the Corporation.

**The Termination of Payments**

50. In March 2020, around the time of the pandemic shutdown, Kats called Defendant and Vera to ask about picking up the monthly dividend check for him and Tsinis.

51. Kats was initially told that M&P was not going to be issuing checks to Kats and Tsinis that month due to the pandemic shutdown.

52. After that initial conversation, Kats contacted Defendant and Vera again to ask when he and Tsinis could expect their next dividend check.

53. In response, Kats was told that he and Tsinis were not going to be receiving any more checks from M&P.

54. Kats and Tsinis then retained a lawyer, who sent a letter to Defendant, dated July 17, 2020, requesting that Defendant: (a) buy Kats and Tsinis out of their 49% interest in M&P;

(b) permit them to inspect M&P's books and records in order to determine the fair market value of their 49% interest.

55. Defendant refused the request for a buyout and refused to allow Kats and Tsinis to inspect M&P's books and records.

### Commencement of the Kings County Action

56. On October 15, 2020, Kats and Tsinis, acting through counsel, commenced an action in New York State Supreme Court, Kings County, entitled *Kats, et al. v. Raziyev,* Index No. 519957/2020 (the "Kings Action"), seeking, among other things, a declaration that they are 49% shareholders in M&P as well as an accounting.

57. After the Kings Action was commenced, Defendant, acting through his counsel, informed counsel for Kats and Tsinis that it was Defendant's position that: (a) Kats and Tsinis were never investors or shareholders in M&P; (b) the $160,000 that they had given to Defendant in December 2003 was not an investment in M&P, but a loan to Defendant; (c) the payments that Kats and Tsinis had been receiving from M&P for 15+ years were not dividends, but installments on the loan to Defendant; and (d) the loan had been fully repaid as of February 2020.

58. Thus, according to Defendant, since Kats and Tsinis were not shareholders in M&P, they had no right to inspect M&P's books and records.

59. Shortly thereafter, Kats and Tsinis, acting through counsel, filed an amended complaint which asserted causes of action against Defendant, both individually and derivatively on behalf of M&P, for: (a) a declaration that Kats and Tsinis are 49% shareholders in M&P; (b) permission to inspect M&P's books and records; (c) an accounting; and (d) breach of fiduciary duty based on Defendant's misuse of M&P's revenues and/or otherwise diverting

revenues that should have been distributed as profits to shareholders. (A copy of the amended complaint in the Kings Action is attached hereto as Exh. 1.)

60. On April 17, 2021, Tsinis passed away, after which his son and daughter were appointed as co-administrators of the Estate of Tsinis and substituted into the Kings Action.

### The Shareholder Status Hearing

61. The Kings Action was assigned to Hon. Reginald Boddie, J.S.C.

62. Justice Boddie determined that the viability of each of Plaintiffs' individual and derivative claims against Defendant turned on whether Kats and Tsinis were shareholders in M&P or whether they had merely lent the money to Defendant.

63. Accordingly, Justice Boddie referred the threshold question of shareholder status to a special referee to hear and report in an order dated January 31, 2022.

64. Hon. Richard Allman was designated as the Special Referee to hear and report on the issue of Plaintiffs' shareholder status.

65. Prior to conducting a hearing, the parties agreed to conduct limited discovery on issues relating to shareholder status, which included depositions of party witnesses.

66. Defendant sat for a deposition on May 24, 2022, during which he testified, among other things, that: (a) Kats and Tsinis agreed to loan him money to develop the business; (b) the interest rate on the loan would be 14.5%; and (c) the total amount that Defendant paid to Kats and Tsinis was approximately $240,000:

> Q. [Plaintiffs' counsel:] Okay. And what was your agreement with Greg [Kats] in terms of when you were going to pay the money back?
>
> A. [Defendant] Well, we didn't specify the concrete term or time, but whenever we met we were discussing it. In all our conversations, we touched these issues, including the interest rate. And finally we came to the agreement that it would be . . . 14.5 percent. That's what

> > we paid in addition to the amount borrowed. And the amount is – the amount of the money paid off is $240,000.
>
> Q. And over what period of time did you pay that $240,000
>
> A. Well, it was like within 15 years.

67. Vera likewise testified at her deposition, on June 1, 2022, that the money given by Kats and Tsinis was a loan to Defendant, and that the interest rate 14.5%:

> Q. [Plaintiffs' counsel:] What was the interest rate?
>
> A. Well, initially, Greg [Kats] was asking a higher rate of interest. We negotiated and we agreed upon 14.5 percent.

68. The hearing on Plaintiffs' status as 49% shareholders in M&P was conducted over eight days in September-October 2022.

69. During the hearing, Defendant and Vera both testified that, when they testified at their respective depositions about the interest rate on the purported loan from Kats and Tsinis, both had made an identical "mistake," and that the interest rate on the supposed loan was actually 4.5%, not 14.5%:

> Q. [Plaintiffs' counsel:] Your deposition was on May 24th and Vera's was not until June 1st, did you tell Vera anything about your deposition testimony before she was deposed on June 1st?
>
> A. [Defendant:] Just in general.
>
> Q. Did you tell her what you had testified to about the interest rate being 14.5 percent?
>
> A. I said yes, but I said I made a mistake. And she said you made a mistake.

70. On or about July 12, 2023, Referee Allman issued a 30-page Report and Recommendation in which he concluded that Plaintiffs were 49% shareholders in M&P.

71. Throughout the Report and Recommendation, Referee Allman observed that testimony given by Defendant and his wife Vera was neither credible nor believable, and

concluded that Defendant's story of how and why Kats and Tsinis gave him their $160,000 was improbable and, ultimately, untruthful.

72. Referee Allman's Report and Recommendation was confirmed by Justice Boddie, in an order dated August 7, 2023, from which no appeal was taken.

**Inspection of Books and Records After the Shareholder Status Hearing**

73. After Plaintiffs were found to be minority shareholders in M&P and, thus, entitled to review the Corporation's books and records as a matter of law, Plaintiffs finally obtained some of the books and records that they had been requesting for many years, but never received.

74. Some books and records were supplied to Plaintiffs by M&P directly, and others were provided by M&P's former outside accountant, who resigned shortly after the Report and Recommendation was issued, but nonetheless agreed to cooperate with Plaintiffs in providing available information.

75. The inspection of M&P's books and records revealed numerous suspicious and unexplained payments and distributions by M&P.

76. Other records clearly showed that Defendant was treating the affairs of M&P as his own corporate pocket without regard for the substance or form of corporate management.

77. By way of example, but not limitation, M&P's books and records established that Defendant:

    a. used company credit cards to pay for his personal expenses and those of his family, such as a cruise from Miami, airline tickets to Israel, and purchases from Sephora and JC Penney;

    b. unilaterally caused M&P to loan him over $200,000 between 2018 – 2021 without any documentation or explanation for these loans;

c. used revenue from M&P to establish and pay the expenses of a competing dumpling business in a new location called M&P Island, Ltd., without accounting for the revenues generated by M&P Island;

d. has subleased a portion of the space leased by M&P to other businesses, but charged all the rent for the entire leased space to M&P without accounting for the rent paid by the subtenants as revenue to M&P;

e. used proceeds from M&P's sales of product to purchase raw materials and other food products that were not used to manufacture M&P's products, and then resold those raw materials and other food products to other companies, without accounting for the revenues generated by those sales; and

f. caused M&P to make monthly lease payments on at least four personal vehicles used by Defendant and/or members of his family.

78. While many of M&P's documents were made available to Plaintiffs, many others were either not provided or missing. For example, M&P's general ledger reflects dozens of payments that do not appear on any of the bank statements provided by M&P or its accountant and Defendant has yet to explain the source of these payments, which suggests the existence of hidden or undisclosed bank accounts under Defendant's control.

**Evidence of Perjury by Defendant Was Revealed After the Shareholder Status Hearing**

79. Email communications between Defendant and M&P's outside accountant that was produced after the shareholder status hearing revealed that Defendant perjured himself at the hearing as part of his scheme to defraud Plaintiffs out of their 49% interest in M&P.

80. For example, contrary to Defendant's testimony at the hearing that he and Vera had always treated the $160,000 from Kats and Tsinis as a loan, Defendant sent an email to

M&P's accountant, after the Kings Action was commenced but before his deposition and the shareholder status hearing, in which Defendant expressly instructed M&P's accountant to "amend" M&P's tax returns to be consistent with Defendant's anticipated false testimony that all payments by M&P to Kats and Tsinis were loan payments:

> You have advised us that certain payments to Gregory Katz and Eduard Tsinis that the corporation has made over the years may have been incorrectly represented on corporate tax returns. You are hereby directed and authorized to amend tax returns of M&P Food Productions Ltd. to reclassify any and all payments to Gregory Katz and Eduard Tsinis as **return of loan payments**. . . [emphasis in original].

(A copy of the letter from Defendant to M&P's accountant is attached as Exh. 2.)

81. In addition, one of the ways that Plaintiffs planned to challenge Defendant's story at the hearing that the $160,000 payment was s loan that was fully paid off in February 2020 was to establish that, if Defendant had received a $160,000 loan with an interest rate of 14.5%, it would not have been fully paid off, and that, based on Defendant's own evidence, there was a $172,000 shortfall.

82. As described above, however, Defendant changed his testimony at the hearing, claiming that the interest rate on the purported loan was only 4.5%, and that he made a "mistake" when he testified at his deposition that the interest rate was 14.5%, which effectively blunted that anticipated line of cross-examination.

83. In an email sent by Defendant before the hearing, however, Defendant explicitly told M&P's accountant to utilize the interest rate of 14.5% when amending M&P's tax returns to reflect the loan payments:

> The LOAN has been taken from Kats, Tsinis in amount of $160,000.00 in December 2003 year; 14,5% for Development."

(A copy of this memo from Defendant to M&P's accountant is attached as Exh. 3.)

13

84. Although Referee Allman found Defendant's story about the loan to be implausible and incredible, this email establishes that Defendant's change in testimony was not due to a "mistake," but a calculated attempt to advance his made-up story that the money from Kats and Tsinis was a loan, which had the effect of prolonging and complicating the shareholder status hearing.

85. The discovery of Defendant's perjury-on-top-of-perjury led Plaintiffs to seek sanctions against Defendant in the Kings Action under 22 NYCRR Part 130-1.1(c)(3), based on Defendant have relied on "material factual statements that are false" to support his position.

86. Plaintiffs' Part 130 sanctions motion was pending at the time Defendant filed his Chapter 7 bankruptcy petition, which stayed the Kings Action, and left the sanctions motion unresolved.

## FIRST CAUSE OF ACTION
## NONDISCHARGEABLE DEBT PURSUANT TO 11 U.S.C. § 523(a)(2)(A)

87. Plaintiffs repeat and reallege each and every of the foregoing allegations of this complaint as though fully set forth herein.

88. Plaintiffs are 49% shareholders of M&P and, as such, are entitled to receive 49% of the profits of M&P.

89. Defendant made misrepresentations, fraudulent omissions and/or engaged in deceptive conduct as described herein that deprived Plaintiffs of dividend payments to which they were entitled and caused them to suffer other damages.

90. Defendant knew of the falsity or deceptiveness of his statements and omissions described herein at the time they were made or omitted, and/or knew that his conduct described herein was false and deceptive when it occurred.

14

91. Defendant had an intent to deceive to Plaintiffs when he made misrepresentations, fraudulent omissions and/or engaged in the deceptive conduct described herein, which included false statements regarding M&P's profits and Defendant's diversion of M&P's revenues to pay Defendant's personal expenses or the expenses of other business in which Defendant, but not Plaintiffs, had an interest.

92. Plaintiffs justifiably relied on Defendants' statements and actions throughout the period they were receiving dividend checks.

93. Plaintiffs suffered damages proximately caused by their reliance on Defendant's misstatements and/or misconduct as described herein, including loss of their share of M&P's profits and additional damages proximately caused by Defendant perjuring himself at the shareholder status hearing in the Kings Action.

94. Defendant's indebtedness to Plaintiffs, in an amount to be determined at trial, was obtained through false pretenses, a false representation, or actual fraud as set forth above.

95. For the reasons set forth above, the Defendant's indebtedness to the Plaintiffs is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

## SECOND CAUSE OF ACTION
## NONDISCHARGEABLE DEBT PURSUANT TO 11 U.S.C. § 523(A)(4)

96. Plaintiffs repeat and reallege each and every of the foregoing allegations of this complaint as though fully set forth herein.

97. Plaintiffs have been minority shareholders in M&P since December 2003.

98. From December 2003 until at least August 2023, Defendant has excluded Plaintiffs from exercising any managerial oversight and prevented Plaintiffs from viewing M&P's books and records.

99. Since December 2003, Defendant has been the majority shareholder of M&P and, accordingly, Defendant has owed fiduciary duties to Plaintiffs.

100. Since December 2003, Defendant has dominated M&P's affairs and finances and, accordingly, Defendant has owed fiduciary duties to Plaintiffs.

101. Since December 2003, all the power and knowledge within M&P has been concentrated in Defendant and, accordingly, Defendant has owed fiduciary duties to Plaintiffs.

102. Since December 2003, Defendant has served as the president of M&P and the sole member of its board of directors, and, accordingly, Defendant has owed fiduciary duties to Plaintiffs.

103. Through his actions described herein, Defendant has knowingly breached his fiduciary duties to Plaintiffs by using his fiduciary position with M&P for his own personal advantage, or for that of his confederates, or to advantage other companies or business ventures in which Defendant, but not Plaintiffs, hold an interest.

104. Through his actions described herein, Defendant has intentionally breached his fiduciary duties to Plaintiffs by using his fiduciary position within M&P to the detriment of Plaintiffs.

105. Through his actions described herein Defendant has intentionally failed to account for Plaintiffs' ownership interests in M&P in breach of his fiduciary duties.

106. Defendant intentionally defalcated M&P's funds and fraudulently incurred debts on behalf of M&P to Plaintiffs' detriment while acting in his fiduciary capacity.

107. For the reasons set forth above, Defendant's indebtedness to Plaintiffs, in an amount to be determined, is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

## THIRD CAUSE OF ACTION
## NONDISCHARGEABLE DEBT PURSUANT TO 11 U.S.C. § 523(A)(4)

108. Plaintiffs repeat and reallege each and every of the foregoing allegations of this complaint as though fully set forth herein.

109. Defendant, in his capacity as president and majority shareholder of M&P, initially had the right to possess the share of revenues and profits earned by M&P that belonged to Plaintiff.

110. Instead of distributing 49% of M&P's profits to Plaintiffs, however, Defendant misappropriated such funds to pay the personal expenses of him and his family and/or diverted such funds to pay the expenses of other business and ventures in which Plaintiffs had no interest and received no benefit.

111. As described herein, the circumstances under which Defendant engaged in such misconduct implied a fraudulent intent.

112. In the manner described herein, Defendant embezzled funds to which Plaintiffs are entitled and that were entrusted to Defendant by Plaintiffs.

113. For the reasons set forth above, Defendant's indebtedness to Plaintiffs, in an amount to be determined, is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

## FOURTH CAUSE OF ACTION
## NONDISCHARGEABLE DEBT PURSUANT TO 11 U.S.C. § 523(A)(6)

114. Plaintiffs repeat and reallege each and every of the foregoing allegations of this complaint as though fully set forth herein.

115. Defendant willfully and maliciously injured Plaintiffs and their property as described herein.

116. For the reasons set forth above, Defendant's indebtedness to Plaintiffs, in an amount to be determined, is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court enter a nondischargeable judgment against Defendant and in favor of Plaintiffs: (i) in an amount to be determined at trial, plus interest, costs, expenses, and reasonable attorneys' fees incurred by the Plaintiffs, and (ii) for such other and further relief as is just and proper.

Dated: New York, New York
March 7, 2024

                GREENBERG FREEMAN LLP

                By: /s/ *Michael A. Freeman*
                     Michael A. Freeman
                     110 East 59th Street, 22nd Floor
                     New York, New York 10022
                     (212) 838-3121
                     freeman@greenbergfreeman.com
                     *Attorneys for Plaintiffs*