SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------------------------x
GREGORY KATS and EDUARD TSINIS,
individually and derivatively on behalf of
M&P FOOD PRODUCTIONS, LTD.,

                            Plaintiffs,

              -against-

PETR RAZIYEV,

                    Defendant,

              -and-

M&P FOOD PRODUCTIONS, LTD.,

                   Nominal Defendant.
------------------------------------------------------------------------x

Index No. 519957/2020
Hon. Debra Silber

**VERIFIED**
**AMENDED COMPLAINT**

       Plaintiffs Gregory Kats ("Kats") and Eduard Tsinis ("Tsinis" and, collectively, "Plaintiffs"), by their undersigned counsel, suing both individually and derivatively on behalf of M&P Food Productions, Ltd. ("M&P" or the "Corporation"), for their verified amended complaint against defendant Petr Raziyev ("Raziyev" or "Defendant") and nominal defendant M&P, allege as follows:

<u>INTRODUCTION</u>

       1.     Raziyev, Kats and Tsinis jointly purchased the Corporation in 2003, and agreed that Raziyev would own 51% of the outstanding shares and that Kats and Tsinis would jointly own the remaining 49% of the outstanding shares.

2.    The parties' respective ownership interests are memorialized in numerous documents described herein, and, over the years Kats and Tsinis received periodic checks from the Corporation identified as "dividend" checks.

3.    At all times since 2003, Raziyev has served as president and sole member of the board of directors for the Corporation.

4.    In or around 2017, Raziyev expanded the Corporation's business by adding a new line of products and promised Kats and Tsinis that, if the new line proved successful, the dividend payments to them would increase.

5.    By all accounts, the new product line was successful, but the dividend payments to Kats and Tsinis did not increase and, in 2020, stopped all together.

6.    In or around August 2020, in response to a demand from Plaintiffs' counsel to review the Corporation's books and records, Raziyev stated that Kats and Tsinis' interest in the Corporation had been diluted and that they owned only 10% of the outstanding shares.

7.    In January 2021, Raziyev changed his position to assert that Kats and Tsinis were never shareholders, but merely lenders to the Corporation, who have been repaid in full.

8.    Plaintiffs now bring this action in their individual capacity for a determination of their rights and status as shareholders in the Corporation and to obtain access to the Corporation's books and records.

9.    Plaintiffs also bring this action derivatively on behalf of the Corporation to obtain damages and an accounting from Raziyev with respect to his waste and misuse of corporate funds and property in violation of his fiduciary duties to the Corporation and its shareholders.

## PARTIES

10.  Plaintiff Kats is a citizen and resident of the State of New York, County of Queens.

11.  Plaintiff Tsinis is a citizen and resident of the State of New York, County of Queens.

12.  Upon information and belief, defendant Raziyev is a citizen and resident of the State of New York, County of Queens, with a residential address of 5822 262nd Street, Little Neck, New York.

13.  Derivative plaintiff and nominal defendant M&P is a corporation organized under the laws of New York with its principal place of business at 830 39th Street, Brooklyn, New York.

## JURISDICTION AND VENUE

14.  This Court has personal jurisdiction over Defendant and M&P pursuant to CPLR § 301 because Defendant resides in the State of New York and M&P is incorporated, has its principal place of business and is doing business within the State of New York.

15.  Venue is proper in Kings County pursuant to CPLR § 503(a) and (c) because M&P has a place of business in Kings County.

## BACKGROUND FACTS

### The Acquisition of M&P

16.  Kats, Tsinis and Raziyev began their business relationship in 1996 when Raziyev became a truck driver for Kats and Tsinis' existing business, a bread distribution company called Bread with Love.

17.  Kats, Tsinis and Raziyev are all of Ukrainian and Russian descent.

18.     In 2003, while driving part of his route for Bread with Love, Raziyev learned that M&P, a manufacturer and distributor of Russian dumplings and other Russian food products located in Brooklyn, was for sale.

19.     The asking price for the business, which included the manufacturing facility and the company's outstanding debt, was $320,000.

20.     Raziyev and his wife Vera Raziyev ("Vera") spent approximately a month reviewing and evaluating the business, after which they decided that they wanted to purchase it.

21.     Raziyev, however, did not have sufficient capital, nor did he have the ability to raise sufficient capital through ordinary lending channels.

22.     For this reason, Raziyev approached Kats about acquiring the business of M&P together.

23.     Kats informed Raziyev that he was interested, but would only enter into a new business venture with Raziyev if Tsinis, his business partner in Bread with Love, was invited to join as well.

24.     Thereafter, the parties agreed that Raziyev, Kats and Tsinis would purchase M&P together and become joint owners of the Corporation.

25.     Following further negotiations among them, in or about September 2003, Raziyev, Kats and Tsinis agreed that they would jointly acquire M&P, and that Raziyev would own 51% of the Corporation and that Katz and Tsinis would jointly own the remaining 49% of the Corporation, divided equally between the two of them.

26.    After reaching an agreement on ownership allocation, Vera prepared a handwritten document, in the parties' native Russian language, that memorialized the ownership and capitalization agreement among the parties (the "Allocation Agreement").

27.    The initial investment of $320,000 to purchase the Corporation was funded as follows: (a) $160,000 from Raziyev; (b) $80,000 from Kats via existing cash and a personal loan; and (c) $80,000 from Tsinis via a personal loan taken out in the name of Tsinis' wife.

28.    Despite the parties' agreement that all three of them would become owners of M&P, Raziyev suggested that he deal directly with the former owner of M&P, and that Kats and Tsinis remain in the background, because if M&P's former owner knew that there were additional investors involved other than Raziyev, he could try to increase the asking price for M&P.

29.    Kats and Tsinis agreed with Raziyev's approach, and concurred that he should be the only one to deal with the former owner in connection with the purchase of M&P.

30.    Accordingly, at the closing for the sale of M&P, Raziyev was the only member of the new ownership group to attend, along with a lawyer.

31.    Due to Raziyev's financial situation and inability to pay, Kats and Tsinis paid for the lawyer that attended the closing with Raziyev.

32.    The closing for the purchase of the Corporation occurred in or around October 2003.

33.    At the closing, since the former owner of M&P believed that Raziyev was purchasing M&P on his own, all the stock of M&P was transferred into Raziyev's name only.

34.     Due to the close and longstanding business relationship among Raziyev, Kats and Tsinis, and the existence of the Allocation Agreement memorializing the parties' agreement, neither Kats nor Tsinis were concerned about stock initially being held in Raziyev's name only.

35.     After the parties purchased M&P, Raziyev assumed the office and title of "president," a title and office that he continues to hold to this day.

36.     Upon information and belief, there are no, and have never been any, other officers of M&P.

37.     After the parties purchased M&P, Raziyev became the sole member of M&P's board of directors.

38.     Upon information and belief, there are no, and have never been any, other directors elected or appointed to M&P's board.

39.      Due to the close and longstanding business relationship among Raziyev, Kats and Tsinis when the parties acquired M&P in 2003, Kats and Tsinis acquiesced to Raziyev appointing himself as president and the sole director of M&P.

40.     Since the parties acquired M&P in 2003, there has never been a formal shareholders' meeting or election of directors.

41.     Upon information and belief, since the parties acquired M&P in 2003, there has never been a formal meeting of the board of directors.

### The Upgrade of the Business

42.     Despite Raziyev holding the position and title of president and being the sole director of M&P, after the parties purchased M&P, they worked together to develop, operate, and try to expand and improve the business.

43.     Initially, it was agreed among all parties that Raziyev and his wife Vera would focus on the production and financial side of the business and that Kats and Tsinis would focus on maintaining and upgrading the factory, as well as sales and distribution of the products.

44.     Because Raziyev and his wife Vera were involved in the day-to-day operations of M&P, while Kats and Tsinis continued to operate Bread with Love and only worked at M&P part-time, all parties agreed that Raziyev and Vera should receive a salary from the Corporation.

45.     It was agreed that Raziyev and his wife Vera should receive a biweekly salary of $750 each, which all parties agreed was fair.

46.     Other than this initial agreement on salaries for Raziyev and Vera, the parties never had any further discussion or agreement about their salaries.

47.     Despite not receiving any salary or other remuneration, during the first several months of operation in 2003-2004, Kats and Tsinis spent hundreds of hours and personally advanced thousands of dollars to maintain and upgrade M&P's manufacturing facility, which was later repaid out of the cashflow from the business.

48.     At the time the parties acquired M&P, the quality of the dumplings and other food products was generally low, which limited the number and type of retailers that were willing to purchase M&P's food products.

49.     In or around March 2004, Kats and Tsinis attended a kitchen and food manufacturing equipment trade show at the Jacob Javits Convention Center, where they met with the representative of a company that manufactured commercial kitchen equipment.

50.     Kats and Tsinis decided that, in order for M&P to be successful, the company was going to have to improve its products and, to do so, it would have to upgrade its food manufacturing equipment.

51.     When Kats and Tsinis informed Raziyev of their desire to upgrade M&P's manufacturing equipment, Raziyev agreed with the plan, but Vera, who was handling the finances and accounting, told them that M&P did not have the roughly $50,000 that would be necessary to acquire all the equipment that was needed.

52.     As a result, Kats, Tsinis and Raziyev decided that the Corporation would borrow money to finance the new equipment.

53.     M&P applied for an equipment lease to finance the new kitchen equipment with a company called Maximum Capital Management ("MCM").

54.     During its due diligence review, MCM discovered that all the stock of M&P was in Raziyev's name, and that his financial situation and creditworthiness were insufficient for MCM to fund the loan.

55.     Thus, to obtain financing for M&P, Raziyev, Kats and Tsinis needed to formalize their ownership agreement and memorialize Kats and Tsinis' joint ownership of a 49% minority interest in M&P.

56.     On or about March 4, 2004, the parties entered into a "Stock Purchase Agreement," dated March 4, 2004 (the "2004 SPA"), pursuant to which Raziyev "sold" to Tsinis and Kats 98 shares of the 200 issued and outstanding shares of M&P, representing a 49% interest in the Corporation.

57.     Consistent with the parties' agreement and the 2004 SPA, the application for the equipment lease identified Kats and Tsinis as "principals" of M&P.

58.     In or about April 2004, M&P signed an equipment lease agreement with MCM to finance the new kitchen equipment.

59.     In or about July 2004, M&P received its new kitchen equipment.

60.     The taste and quality of M&P's dumplings and other food products increased dramatically once the new equipment was installed.

61.     Given the improvement of M&P's food products, all the owners agreed that it would be wise to rebrand M&P with a new logo and packaging as a way of disassociating itself with the former, lower-quality food products, and then make a business and marketing push to expand M&P's sales and distribution with its newer, higher-quality food products.

The Expansion of the Business

62.     Once M&P received its packaging bags with the new logo, the Corporation, led by Kats and Tsinis, began approaching new potential vendors and customers, including many who were already vendors and customers of Bread with Love, to see if they were interested in purchasing and selling M&P's new and improved food products.

63.     Meanwhile, Raziyev and his wife Vera remained primarily in charge of M&P's food production operations and the financial side of the business.

64.     The new marketing efforts proved successful, resulting in increased revenues for the Corporation in 2004-2005.

65.     By 2005, M&P was generating enough revenue to start distributing dividends to the shareholders.

66.     The dividend payments that Kats and Tsinis received at this time were typically $1000 each.

67.     Upon information and belief, each time Kats and Tsinis received a dividend check, Raziyev received a dividend check equal, or roughly equal, to the sum of those checks.

68.     From the time Kats and Tsinis first started receiving dividend payments, each dividend was distributed by a corporate check that was handwritten and signed by Vera on behalf of the Corporation.

69.     Vera typically (but not always) wrote the word "dividends" on the memo line of the dividend checks distributed to Kats and Tsinis.

A Second Equipment Upgrade

70.     In or around November 2006, the parties agreed that M&P should acquire additional manufacturing equipment, and agreed that, as in 2004, they should obtain an equipment lease to finance the new equipment.

71.     Unlike in 2004, this second equipment financing was handled primarily by Raziyev.

72.     During the application process, to confirm their ownership status, the parties took a blank version of the 2004 SPA and re-executed the identical document for a second time before a notary on November 18, 2006 (the "2006 SPA").  (A true and correct copy of the 2006 SPA is attached hereto as Exhibit 1.)

73.     The second equipment lease was approved, and M&P acquired the new manufacturing equipment for its facility in or about December 2006.

The 2011 Buyout Request

74. From approximately 2005-2011, the Corporation distributed dividend payments to Kats and Tsinis approximately ten out of 12 months each year.

75. By December 2011, Kats and Tsinis had little day-to-day involvement in the business and decided to ask Raziyev if he was interested in buying them out of their 49% interest in the Corporation.

76. Kats and Tsinis met with a lawyer and, on or about December 8, 2011, the lawyer sent Raziyev a letter stating that Kats and Tsinis "wish to leave the . . . business" and asking Raziyev to buy them out (the "2011 Buy-Out Request").

77. The 2011 Buy-Out Request stated that Kats and Tsinis owned 49% of the Corporation and enclosed a copy of the 2006 SPA that the parties had signed.

78. The 2011 Buy-Out Request stated that Kats and Tsinis had estimated the value of the Corporation at $900,000, and requested various books and records of the Corporation so that this valuation could be confirmed.

79. The 2011 Buy-Out Request asked that Raziyev provide a written response in two weeks.

80. Raziyev responded to the 2011 Buy-Out Request within two weeks, as requested, via an undated letter sent by certified mail (the "2011 Response Letter").

81. Raziyev's 2011 Response Letter stated that his lawyer was out of the country, and asked whether it would be possible to supply the requested documents after December 26, 2011.

82. Raziyev's 2011 Response Letter did not deny or dispute the statements in the 2011 Buy-Out Request stating that Kats and Tsinis jointly owned 49% of M&P.

11

83. Raziyev's 2011 Response Letter did not dispute or challenge the authenticity or validity of the 2006 SPA.

84. Nonetheless, Raziyev failed to follow through on his offer to supply the requested books and records of the Corporation and never expressly responded to Kats and Tsinis' request for Raziyev to buy them out.

85. Shortly after counsel for Kats and Tsinis sent the 2011 Buy-Out Request, Kats and Tsinis learned that Raziyev's wife Vera had been diagnosed with cancer.

86. Sensing that Raziyev was distracted with his wife's cancer treatment, Kats and Tsinis decided to drop their 2011 request to be bought out of M&P.

87. Thereafter, Kats and Tsinis remained 49% joint shareholders in the Corporation and continued to receive their periodic dividend checks.

The 2015 FLSA Action and the Dividend Reduction

88. In or around May 2015, M&P was sued by one of its employees for alleged violations of the Fair Labor Standards Act ("FLSA") in federal court in Brooklyn, New York (the "FLSA Action").

89. The named defendants in the action were M&P and Raziyev.

90. Raziyev and M&P hired a law firm to represent them in defending the FLSA Action.

91. The complaint in the FLSA Action alleged, among other things, in ¶ 9, that Raziyev was the owner of M&P.

92. In his answer to ¶ 9 of the complaint in the FLSA action, Raziyev admitted that he was the "president" of M&P, but denied that he was the sole owner of M&P.

93.     The FLSA settled in February 2016 pursuant to an on-the-record settlement agreement under which M&P and Raziyev agreed to pay the plaintiff $21,500.

94.     While the lawsuit was pending, Raziyev and Vera told Kats, on behalf of both Plaintiffs, that due to the cost of paying attorneys to defend the FLSA Action and the settlement, there was insufficient money left in the Corporation to pay dividends to Plaintiffs at that time.

95.     When the dividend payments resumed in 2016, instead of the typical dividend amount of $1000 that they were receiving prior to the FLSA Action, the dividend payments to Kats and Tsinis were typically only $500.

96.     Like the earlier dividend checks, the post-2015 dividend checks were corporate checks issued by M&P that were handwritten and signed by Vera.

97.     Like the earlier dividend checks, many (but not all) of the post-2015 checks had the word "dividends" written by Vera on the memo line of the check.

98.     When Katz, on behalf of both Plaintiffs, questioned in 2016 why the dividend payments had been reduced, he was told by Raziyev and Vera that M&P did not have sufficient profits to pay a larger dividend.

The Expansion of the Business To Include a Kosher Line of Products

99.     In or about 2017, Raziyev decided to expand M&P's business by manufacturing and selling a Kosher line of Russian food products.

100.    To produce the Kosher line of products, M&P expanded its operations in its existing facility by taken over a portion of the space that was previously being subleased to another tenant.

101.    Whereas previously all the owners would consult and seek to agree on major business decisions relating to M&P, Raziyev decided to expand M&P's business into Kosher foods

13

and terminate the sublease at M&P's facility without first consulting with Kats or Tsinis, evidencing his dominance and control over the Corporation and the exclusion of Kats and Tsinis.

102.    The expansion of M&P's business to include a line of Kosher products was funded by M&P's existing operations and revenues.

103.    When Kats, on behalf of both Plaintiffs, inquired about the expansion plans, Raziyev told him that if the sale of Kosher products proved successful, both Kats and Tsinis could expect an increase in their dividend payments.

104.    Based on their observations and the business information that was available to them, it appeared to Kats and Tsinis by 2018 that M&P's Kosher line of products was a great success.

105.    Kats and Tsinis, however, did not receive any increase in the amount of their dividend payments.

106.    Starting in or around mid-2018, Kats, on behalf of both Plaintiffs, began questioning Raziyev and Vera about why the dividend payments had not increased in amount or frequency following the successful expansion of M&P's business to include a Kosher line of products.

107.    Kats also asked if he could review some of M&P's financial information to see how the Corporation was doing.

108.    Raziyev and Vera repeatedly deflected these inquiries.

109.    Upon information and belief, which can only be confirmed by a review of the Corporation's books and records, since at least 2018, Raziyev has been paying himself and Vera

excessive salaries and otherwise taking money out of the business for his personal use, which has deprived Kats and Tsinis of receiving dividends that reflect the Corporation's increased profits.

<u>The 2020 Demand for Information and a Buy-Out</u>

110.     In March 2020, around the time of the government-mandated business shutdown necessitated by the COVID-19 pandemic, Tsinis drove to M&P's facility in Brooklyn to investigate what was going on with the business.

111.     When Tsinis arrived at the facility, he spoke with Vera, who told Tsinis that business was poor, and that M&P would be unable to make any dividend payments until further notice.

112.     In or around July 2020, Kats and Tsinis retained a new lawyer.

113.     On July 17, 2020, counsel for Kats and Tsinis sent a "Demand Letter" to Raziyev (the "2020 Demand Letter").

114.     The 2020 Demand Letter, like the 2011 Buy-Out Request, identified Kats and Tsinis as 49% joint shareholders in M&P, and enclosed a copy of the 2006 SPA signed by all parties.

115.     The 2020 Demand Letter, like the 2011 Buy-Out Request, requested that Raziyev purchase Kats and Tsinis' 49% interest in M&P.

116.     The 2020 Demand Letter, like the 2011 Buy-Out Request, requested that the Corporation provide Kats and Tsinis with the following books and records for inspection:  (a) books, records, accounts, minutes, journal entries, ledgers, invoices; (b) federal and state income tax returns; (c) financial statements and detailed balance sheets; (d) profit and loss statements; (e) list of assets and working capital; (f) lists of debts and liabilities; (g) existing orders, obligations

and contracts; (h) documents concerning any stock transfers; (i) records of dividend payments; (j) list of intangible assets and goodwill; (k) future cashflow projections; and (l) budgets, plans and projections of future performance.

117. After receiving the 2020 Demand Letter, Raziyev spoke with counsel for Kats and Tsinis twice by telephone in or around August 2020.

118. During each of those calls, Raziyev informed counsel for Kats and Tsinis that, contrary to what was stated in the 2020 Demand Letter, Kats and Tsinis did not jointly own a 49% interest in M&P because their interest had been diluted by the sale of stock to other, unidentified third parties, and that Kats and Tsinis' joint ownership interest in M&P was only 10%.

119. Raziyev's statements in or around August 2020 were the first time, since M&P was acquired by the parties in 2003, that Raziyev had ever challenged or disputed Kats and Tsinis' 49% joint ownership in M&P, or otherwise asserted that they jointly owned less than 49% of M&P.

120. Thereafter, Raziyev retained counsel and had no further direct conversations with Kats, Tsinis or their counsel.

121. Acting through its counsel, M&P refused to produce to Kats and Tsinis any of the corporate books and records requested in the 2020 Demand Letter.

<u>Commencement of This Action and Raziyev's Assertion That Plaintiffs Are Not Shareholders</u>

122. On October 15, 2020, Plaintiffs commenced this action.

123. On November 27, 2020, Raziyev, through his counsel, moved to dismiss this action.

124. On January 8, 2021, counsel for Plaintiffs and counsel for Raziyev had a telephone conversation to discuss an extension of time for Plaintiffs to respond to the motion.

16

125.	During that call, Raziyev's counsel stated that it was Raziyev's position that Kats and Tsinis were never shareholders in M&P, but merely lent money to M&P, and that they have been fully repaid.

126.	This was the first time, since M&P was acquired by the parties in 2003, that Raziyev had ever challenged or disputed that Kats and Tsinis were shareholders in M&P.

<u>A Demand on the Corporation Would Have Been Futile</u>

127.	 Plaintiffs, individually and jointly, are shareholders in M&P and were shareholders at the time of the misconduct alleged herein.

128.	Prior to commencing this action, Plaintiffs did not make a formal demand on the board of directors of the Corporation to address the misconduct alleged herein, because any such demand would have been futile.

129.	A demand on the board of directors would have been futile because Raziyev is the sole member of the board of directors of the Corporation, and he stands accused of the misconduct alleged herein, which includes charges that Raziyev is paying himself and his wife Vera excessive salaries, that Raziyev is otherwise taking money out of the Corporation for his personal use, and that Raziyev has deprived the shareholders of dividends that reflect the Corporation's profits.

130.	Raziyev's refusal to allow Plaintiffs to review the books and records of the Corporation in the face of accusations that Raziyev has been paying himself and his wife Vera excessive salaries and other payments that benefit him personally, to the exclusion of the other shareholders, disqualifies Raziyev from being able to make an independent decision on whether to act in response to Plaintiffs' assertions of this misconduct, which excuses any demand upon Raziyev, the sole director of the Corporation, because it would be futile.

131.     The futility of a demand upon Raziyev, as the sole member of the board, is further established because Raziyev's misconduct as described herein, including his refusal to allow Plaintiffs to examine the Corporation's books and records in response to accusations of his personal financial misconduct, is so egregious on its face that it could not have been the product of sound business judgment.

## AS AND FOR A FIRST CAUSE OF ACTION
(Declaratory Relief, By Plaintiffs in Their Individual Capacity)

132.     Plaintiffs repeat and reallege the foregoing allegations of the amended complaint as if set forth fully herein.

133.     Raziyev, Kats and Tsinis agreed to jointly acquire the Corporation in 2003.

134.     Pursuant to their oral agreement and the Allocation Agreement, Raziyev was to own 51% of the outstanding shares in the Corporation and Kats and Tsinis were to jointly own the remaining 49% of the outstanding shares.

135.     When the sale of the Corporation closed, for reasons described herein, 100% of the Corporation's shares were placed in Raziyev's name, notwithstanding the agreement among the parties that Raziyev owned only 51% and Kats and Tsinis jointly owned the remaining 49%.

136.     In March 2004, the parties executed the 2004 SPA, which served to memorialize the parties' existing agreement that Raziyev owned 51% of the outstanding shares in the Corporation and Kats and Tsinis jointly owned the remaining 49% of the outstanding shares.

137.     In November 2006, the parties executed the 2006 SPA, which was identical in all material respects to the 2004 SPA, and reaffirmed the parties' existing agreement that Raziyev owned 51% of the outstanding shares in the Corporation and Kats and Tsinis jointly owned the remaining 49% of the outstanding shares.

138.    From the time the Corporation was jointly purchased in 2003 until July 2020, Kats and Tsinis understood and believed that they were 49% shareholders in the Corporation.

139.    In July 2020, Raziyev informed counsel for Kats and Tsinis that, due to the sale of an interest in the Corporation to one or more unidentified third parties. Kats and Tsinis' joint interest in the Corporation had been diluted, and that Kats and Tsinis actually owned only 10% of the outstanding shares in the Corporation.

140.    In January 2021, counsel for Raziyev informed counsel for Kats and Tsinis of Raziyev's position that Kats and Tsinis were never shareholders in the Corporation, but were merely lenders to the Corporation who had already been fully repaid.

141.    An actual and justiciable controversy exists as to whether Kats and Tsinis are shareholders in the Corporation and, if so, the percentage of their joint ownership interest.

142.    Plaintiffs seek a judgment from this Court, pursuant to CPLR § 3001, declaring that Kats and Tsinis own 49% of the outstanding shares in the Corporation.

**AS AND FOR A SECOND CAUSE OF ACTION**
(Demand To Inspect the Books and Records of the
Corporation, By Plaintiffs in Their Individual Capacity)

143.    Plaintiffs repeat and reallege the foregoing allegations of the amended complaint as if set forth fully herein.

144.    Plaintiffs are shareholders in the Corporation.

145.    As shareholders, Plaintiffs have a common law right to examine the books and records of the Corporation on reasonable notice to the Corporation.

146.    Pursuant to N.Y. Business Corporation Law § 624(b), any shareholder, upon at least five days' written demand, shall have the right to examine in person or by agent or attorney, during

usual business hours, the corporation's minutes of the proceedings of its shareholders and its record of shareholders, and to make extracts therefrom for any purpose reasonably related to such person's interest as a shareholder.

147.    Pursuant to N.Y. Business Corporation Law § 624(e), upon the written request of any shareholder, the corporation shall give or mail to such shareholder, within a reasonable time after such request, an annual balance sheet and profit and loss statement for the preceding fiscal year, and, if any interim balance sheet or profit and loss statement has been distributed to its shareholders or otherwise made available to the public, the most recent such interim balance sheet or profit and loss statement.

148.    On July 17, 2020, Plaintiffs, acting through their counsel, sent Raziyev, as president of the Corporation, the 2020 Demand Letter, which included a written request to inspect certain books and records of the Corporation.

149.    Among the books and records requested were the Corporation's minutes, balance sheet and profit and lost statement.

150.    The request by Kats and Tsinis to inspect the books and records was sought in good faith and for a proper and valid purpose, which include, among other things, to determine their ownership status, whether there is evidence of the corporate misconduct by Raziyev alleged herein and whether all appropriate distributions to the shareholders have been made.

151.    Despite a timely written request and a proper and valid purpose, Raziyev, purporting to act on behalf of the Corporation, has refused to permit Plaintiffs to inspect the Corporation's books and records.

152. Plaintiffs seek an order and judgment from this Court directing Raziyev to permit Plaintiffs or their designated agent(s) to inspect the Corporation's book and records at a reasonable time and place.

## AS AND FOR A THIRD CAUSE OF ACTION
(Breach of Fiduciary Duty, By Plaintiffs Derivatively on Behalf of the Corporation)

153. Plaintiffs repeat and reallege the foregoing allegations of the amended complaint as if set forth fully herein.

154. In his capacity as president, sole director and majority shareholder of M&P, Raziyev owes a fiduciary duty of care, loyalty and the utmost good faith to the Corporation and its shareholders.

155. By his actions alleged in this amended complaint, including the payment of excessive salaries to himself and his wife and the use of corporate funds to pay for personal expenses, Raziyev has breached his fiduciary duties to the Corporation and its shareholders.

156. Raziyev's breach of his fiduciary duties has proximately caused injury to the Corporation and its shareholders, including, but not limited to, the deprivation of dividends to the shareholders.

157. The Corporation and its shareholders have suffered damages in an amount that cannot currently be determined because of lack of access to the Corporation's books and records, but that will be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
(Accounting, By Plaintiffs Derivatively on Behalf of the Corporation)

158. Plaintiffs repeat and reallege the foregoing allegations of the amended complaint as if set forth fully herein.

159. Plaintiffs are shareholders in the Corporation.

160. Raziyev, as the president, sole member of the board of directors and majority shareholder of the Corporation, maintains a fiduciary relationship with the Corporation and its shareholders.

161. The assets of the Corporation entrusted to Raziyev impose upon him a duty to account.

162. Raziyev now completely controls and dominates the Corporation.

163. Upon information and belief, Raziyev has caused the Corporation to pay excessive salaries to him and his wife Vera, and has withdrawn other monies from the Corporation for his personal use, to the detriment of the Corporation and its shareholders.

164. In using the funds of the Corporation to pay excessive salaries to Raziyev and his wife, and to pay for other personal expenses, Raziyev has breached his fiduciary duties to the Corporation and its shareholders.

165. As a result of Raziyev's actions, the Corporation has been deprived of funds for the operation of its business, and the shareholders of the Corporation have been deprived of dividends, while the value of the shareholders' investments have continuously decreased.

166. Raziyev's misconduct is continuous and ongoing.

167. Plaintiffs are without an adequate remedy at law.

168. Plaintiffs seek an order and judgment directing Raziyev to account for his conduct in the management of the Corporation, and the use and disposition of corporate funds and property, and that he be compelled to account for and repay to the Corporation all money lost, wasted, or

improperly diverted as a result of his violation of his fiduciary obligations to the Corporation and its shareholders.

WHEREFORE, Plaintiffs, both individually and derivately on behalf of the Corporation, demand judgment as follows:

A.    on the first cause of action, a judgment in favor of Plaintiffs declaring that Plaintiffs jointly own 49% of the outstanding shares in the Corporation;

B.    on the second cause of action, a judgment in favor of Plaintiffs directing Defendant to permit Plaintiffs and/or their designated agent(s) to inspect the Corporation's book and records at a reasonable time and place;

C.    on the third cause of action, a judgment in favor of the Corporation equal to the damages proximately caused to the Corporation and its shareholders by Defendant's breach(es) of his fiduciary duties;

D.    on the fourth cause of action, a judgment in favor of the Corporation directing Raziyev to account for his conduct in the management of the Corporation, and the use and disposition of corporate funds and property, and that Raziyev be compelled to account for and repay to the Corporation all money lost, wasted, or improperly diverted as a result of his violation of his fiduciary obligations to the Corporation and its shareholders;

E.    on all causes of action brought derivatively on behalf of the Corporation, that the Corporation be required to indemnify and reimbursement Plaintiffs for its reasonable attorneys' fees, and legal costs and expenses;

F.    on all causes of action, prejudgment interest on any damages award, as well as costs and disbursements; and

G.      for such other and further relief as this Court deems just and proper.

Dated:   New York, New York
         February 12, 2021

                                        GREENBERG FREEMAN LLP

                                        By:___/s/ *Michael A. Freeman*_____
                                            Michael A. Freeman
                                            110 East 59th Street, 22nd Floor
                                            New York, NY  10022
                                            (212) 838-3121
                                            freeman@greenbergfreeman.com
                                            *Attorneys for Plaintiffs Kats and Tsinis*

TO:     SAUCHIK & GIYAUR, P.C.
        Alec Sauchik
        17 Battery Place Suite 305
        New York, NY 10004
        (212) 668-0200
        asauchik@mdrxlaw.com
        *Attorneys for Defendant Raziyev*

82BE32A2-9908-476B-9C94-3B63204BE730 --- 2021/02/12 07:38:01 -8:00 --- Remote Notary

VERIFICATION

STATE OF ~~NEW YORK~~ Pennsylvania )
                                    ) ss.:
COUNTY OF ~~NEW YORK~~ Philadelphia )

    MICHAEL A. FREEMAN, being duly sworn, deposes and says:

    1.    I am a partner in Greenberg Freeman LLP, counsel to plaintiffs Gregory Kats and Eduard Tsinis.

    2.    I have read the foregoing verified amended complaint, and the factual statements contained therein are true and correct to the best of my information and belief, except for those statements made upon information and belief, as to which I believe them to be true.

    3.    I am executing this verification on behalf of plaintiffs because they are united in interest and pleading together, and neither of them is located or resides within the county where I maintain my office.



Michael Freeman
Signed on 2021/02/12 07:46:43 -8:00

_____
MICHAEL A. FREEMAN

Sworn to before me this
12th_____ lay of February 2021

Sarah M Taylor
_____
Notary Public

Commonwealth of Pennsylvania - Notary Seal
Sarah M Taylor, Notary Public
Philadelphia County
My Commission Expires Jan 17, 2025
Commission Number 1274115
Notary Stamp 2021/02/12 08:46:43 PST                    2CEF9710464C

25

DocVerify ID: 82BE32A2-9908-476B-9C94-3B63204BE730
www.docverify.com
Page 25 of 25    253B63204BE730
