GREENBERG FREEMAN LLP
Michael A. Freeman
110 E. 59th Street, Fl. 22
New York, New York 10022
(212) 838-3121
freeman@greenbergfreeman.com
*Counsel for the Plaintiffs*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
IN RE:

PETR RAZIYEV,

    Debtor.

-------------------------------------------------------------x

GREGORY KATS; and ALEXANDER TSINIS
and DIANA TSINIS, as Co-Administrators
of the Estate of Eduard Tsinis, individually
and derivatively on behalf of M&P FOOD
PRODUCTIONS, LTD.,

    Plaintiffs,

-against-

PETR RAZIYEV,

    Defendant.

-and-

M&P FOOD PRODUCTIONS, LTD.,

    Nominal Defendant.

-------------------------------------------------------------x

Chapter 7

Bankr. Case No. 1-23-44424 (nhl)

Adv. Proc. No. 24-1038

### PLAINTIFFS' OBJECTION TO THE DEBTOR'S MOTION TO DISMISS THE COMPLAINT OBJECTING TO THE DISCHARGEABILITY OF DEBTS DUE AND OWING BY DEBTOR TO PLAINTIFFS

    Plaintiffs Gregory Kats ("Kats") and Alexander Tsinis and Diana Tsinis, in their capacity

as the co-administrators of the estate Eduard Tsinis ("Estate of Tsinis" and, collectively,

"Plaintiffs"), by their undersigned counsel, respectfully submit this objection (the "Objection") to the motion ("Motion") (ECF No. 6, 7)[1] by debtor and defendant Petr Raziyev ("Defendant" or "Debtor") to dismiss the complaint ("Complaint") (ECF No. 1) objecting to the dischargeability of debts due and owing by Defendant to Plaintiffs, and respectfully state as follows:

## INTRODUCTION

1. Almost 20 years after Plaintiffs and Defendant had jointly purchased a food manufacturing company in Brooklyn called M&P Food Productions, Ltd. ("M&P" or the "Corporation"), Defendant tried to cheat Plaintiffs out of their interests by claiming that Plaintiffs were never owners of M&P, but merely lenders who had been paid in full.

2. In response to Defendant's audacious scheme to steal their interests in M&P, Plaintiffs commenced an action in New York Supreme Court, Kings County, in which they sought, *inter alia*, a declaration that they were owners of M&P, access to books and records, and an accounting.

3. Following a hearing with live testimony on the issue of whether Plaintiffs are shareholders of M&P, the court found that Plaintiffs are and have always been shareholders in M&P, and that Defendant had lied when he claimed that Plaintiffs were just lenders.

4. Beyond that, M&P's books and records and other documents produced in discovery after the hearing revealed that Defendant knowingly gave false testimony as to the existence of a loan, and that he had asked his then-accountant to modify M&P's records to support Defendant's lie.

---

[1] Unless otherwise indicate, reference to the ECF docket shall refer to entries in this adversary proceeding, not the main bankruptcy.

5. Moreover, when Plaintiffs gained access to M&P's books and records, they discovered that Defendant was cheating them out of their fair share of the profits and using M&P as his personal corporate pocket in breach of his fiduciary duty.

6. In an attempt to avoid payment of the inevitable judgment against him, Defendant filed for bankruptcy on November 30, 2023, which stayed the state court action.

7. This led Plaintiffs to commence this adversary proceeding objecting to the discharge of the debts owed to Plaintiffs under § 523(a) of the Bankruptcy Code.

8. In response, Defendant has filed the instant Motion to dismiss.

9. The Motion raises arguments which are both factually inaccurate and legally deficient and, for the reasons stated below, the Motion should be denied.

## BACKGROUND FACTS[2]

10. In December 2003, three men – Defendant, Kats, and the late Eduard Tsinis ("Tsinis") – pooled their money to purchase M&P, a manufacturer and distributor of Russian dumplings and other Russian food products located in Brooklyn, for $320,000. (Complaint ¶¶ 10-19.)

11. Very little of what the parties agreed to was in writing. Instead, the parties orally agreed that Defendant would contribute $160,000 towards the purchase price and that Kats and Tsinis would jointly contribute the other $160,000. (Complaint ¶¶ 16-17.)

12. The parties further agreed orally that, although they were investing equal amounts, Defendant would own 51% of the Corporation because he was going to be responsible for the day-to-day operation of the business, and that Katz and Tsinis, who had other businesses

---

[2] These background facts are derived from the Complaint (ECF No. 1), and must be accepted as true for purposes of a motion to dismiss.

and intended only be involved at M&P part-time, would jointly own the remaining 49% of the Corporation, divided equally between the two of them. (Complaint ¶ 18.)

13. By 2005, M&P was generating enough revenue to start distributing dividends to the shareholders. (Complaint ¶ 32.)

14. As result, Kats and Tsinis received monthly dividend checks that varied from time to time, but that were typically around $1,000 each. (Complaint ¶ 33.)

15. The dividend payments that Kats and Tsinis received were distributed by a corporate check that was handwritten and signed by Defendant's wife Vera Raziyeva ("Vera"), who was employed by M&P to handle the finances of the Corporation. (Complaint ¶¶ 34-35.)

16. Many of the checks given to Kats and Tsinis by Vera, with Defendant's knowledge and consent, contained Vera's handwritten notation on the memo line of the check indicating that the payments were "dividends," which evidence Kats's and Tsinis's status as shareholders checks. (Complaint ¶ 36.)

17. Kats and Tsinis rarely, if ever, reviewed the Corporation's books and records to determine whether the dividends they received represented a proportionate share of M&P's profits, but relied upon and trusted Defendant to distribute profits in accordance with each owner's interest. (Complaint ¶¶ 40-49.)

18. The practice of Defendant or his wife issuing monthly dividend checks to Kats and Tsinis continued until March 2020, right around the time of the pandemic shutdown. (Complaint ¶ 50.)

19. At that time, when Kats called Defendant and Vera to ask about picking up the monthly dividend check for him and Tsinis, Kats was told that M&P was not going to be

issuing any checks to Kats and Tsinis that month due to the pandemic shutdown. (Complaint ¶ 51.)

20. After that initial conversation, Kats contacted Defendant and Vera again to ask when he and Tsinis could expect their next dividend check. (Complaint ¶ 52.)

21. In response, Kats was told that he and Tsinis were not going to be receiving any more checks from M&P, which caused Kats and Tsinis to hire a lawyer. (Complaint ¶¶ 53-54.)

22. After Plaintiffs hired a lawyer, Defendant completely changed his position, and informed counsel for Kats and Tsinis that the reason why Katz and Tsinis stopped receiving checks in March 2020 was that: (a) Kats and Tsinis were never investors or shareholders in M&P; (b) the $160,000 that Kats and Tsinis had provided to Defendant when M&P was purchased in 2003 was not an investment at all, but merely a loan to Defendant; and (c) the "loan" had been fully repaid as of February 2020. (Complaint ¶ 57.)

23. Kats and Tsinis then sued Defendant in New York State Supreme Court, Kings County (the "Kings Action"), and demanded relief which included, *inter alia*, a declaration that they are 49% shareholders in M&P and an accounting of M&P's books and records. Kats and Tsinis also sued to recover the dividend payments to which they were entitled when Defendant stopped paying them in March 2020, and asserted a derivative claim on behalf of M&P for breach of fiduciary duty in the event that the accounting revealed that Defendant had been improperly diverting money and assets of M&P instead of making proper distributions to shareholders. (Complaint ¶ 59.)

24. The judge assigned to the Kings Action determined that the viability of each of Plaintiffs' claims against Defendant turned on the issue of whether Kats and Tsinis were

shareholders in M&P, as they claimed, or whether, they had merely lent the money to Defendant, as Defendant had claimed, and referred this threshold question of shareholder status to a special referee to hear and report. (Complaint ¶ ¶ 61-63.)

25. The special referee appointed, Hon. Richard Allman, held an eight-day hearing, which included live witness testimony by all the parties and multiple non-party witnesses. (Complaint ¶¶ 64, 68.)

26. Following the hearing, Referee Allman issued a 30-page Report and Recommendation in which he concluded that Plaintiffs were 49% shareholders in M&P. (Complaint ¶ 70.) (A copy of the Report and Recommendation is available on the docket in the Kings Action at [NYSCEF Dkt. #49](NYSCEF Dkt. #49).)

27. Throughout his Report and Recommendation, Referee Allman stated that the testimony given by Defendant and his wife Vera was neither credible nor believable, and that Defendant's story of how and why Kats and Tsinis gave him their $160,000 was improbable and untruthful. (Complaint ¶ 71.)

28. In other words, while the Report and Recommendation contained language that showed the appropriate level of judicial restraint and decorum, Referee Allman concluded that Defendant and his wife had lied under oath and that Defendant had tried to defraud Plaintiffs out of their interest in M&P. (*Id*.)

29. After the hearing was concluded and Plaintiffs were found to be minority shareholders, they reviewed the Corporation's books and record. In addition, through discovery, Plaintiffs' obtained communications and other documents created by Defendant and his wife during their operation of the business. (Complaint ¶¶ 73, 79.)

30. As detailed in the Complaint, Plaintiffs' inspection of M&P's books and records revealed that Defendant was using M&P as his corporate pocket without regard for the substance or form of corporate management for the advantage of himself and members of his family, and to the detriment of Plaintiffs. (Complaint ¶¶ 75-77.)

31. Among the misconduct revealed by Plaintiffs' inspection of M&P's books and records was that Defendant: (a) used company credit cards to pay for travel, clothes and other personal expenses for himself and his family; (b) caused M&P to loan him over $200,000 between 2018 – 2021 to hide and artificially reduce the company's revenue; and (c) used M&P's revenue to pay expenses unrelated to M&P's core business and then diverted the income derived from those non-core functions to himself. (Complaint ¶ 77.)

32. Communications between Defendant and his former accountant, which Plaintiffs obtained during discovery in the Kings Action, also established that Defendant and Vera perjured themselves at the shareholder status hearing, and that they had asked their former accountant to alter documents to support their false claim that the money Defendant received from Kats and Tsinis in 2003 was just a loan. (Complaint ¶¶ 79-84.)

33. The discovery of these communications led Plaintiff to file a sanctions motion in the Kings Action pursuant to N.Y.C.R.R. Part 130:1-1 (the "Sanctions Motion"), by which Plaintiffs sought to recover a portion of the attorneys' fees they incurred at the shareholder status hearing, which was lengthened and made more complex due to the willful and malicious conduct of Defendant and his wife of providing perjured testimony under oath. (Complaint ¶ 85.)

## DEFENDANT'S BANKRUPTCY FILING AND RELATED PROCEEDINGS

34. On November 30, 2023, while the Kings Action, as well as the Sanctions Motion were still pending, and amid "meet and confer" discussions among counsel over Defendant's unjustified refusal to turn over certain information that Plaintiffs had requested, Defendant filed for Chapter 7 bankruptcy protection.

35. Due to Defendant's bankruptcy filing, the Kings Action was stayed and the Sanctions Motion was not decided.

36. Defendant's initial Schedules of Assets and Liabilities, submitted with his filing list both Plaintiffs as creditors with unsecured claims that Defendant has valued at $500,000 each (or $1 million in total). (Bankruptcy Case No 1-23-44424-nhl, ECF No., p. 21.)[3]

37. No bar date has been set and there is no deadline for filing proof of claims. (Bankruptcy Case No 1-23-44424-nhl, ECF No. 5.)

38. The deadline to object to discharge or to challenge whether certain debts are dischargeable was March 8, 2024.

39. On February 21, 2024, Plaintiffs' undersigned counsel contacted Debtor's counsel to request a 30-day extension on consent to file objections to discharge.

40. Debtor's counsel refused to grant an extension of the deadline to file objections to discharge.

41. Plaintiffs filed their Complaint in this adversary proceeding on March 7, 2024.

---

[3] Neither in their pleadings nor any demand that Plaintiffs made prior to Defendant's bankruptcy filing did Plaintiffs contend that the value of their claims was anywhere close to $1 million, which is close to 60% of Defendant's reported liabilities. All of the other debts listed by Debtor are listed as undisputed debts owed to various financial institutions, and none of these debts are beyond the Debtor's ability to pay in light of his stated annual income. This reflects that Defendant's primary (if not sole) objective in filing for bankruptcy was to try to avoid his debts to Plaintiffs.

42. After obtaining a two-week extension from Plaintiffs' counsel to respond to the Complaint to allow for counsel and the parties to discuss a possible resolution of their dispute, Defendant filed this Motion.

43. One day before filing this Motion, Debtor amended his Schedules of Assets and Liabilities to indicate that that debts owed to Plaintiffs are based on "derivative" claims being brought on behalf of M&P that are worth $500,000 each. (Bankruptcy Case No 1-23-44424-nhl, ECF No., 11, pp. 5-6.) The amended Schedule also lists Plaintiffs as having other individual claims in an "unknown" amount. (*Id*.) All of the listed debts owed to Plaintiffs have been characterized by Debtor as "disputed," "unliquidated" and "contingent." (*Id*.)

## **OBJECTION**

**Plaintiffs Have Standing and Their § 523 Action Is Not Premature**

44. Defendant's first argument in support of the Motion is that this action is "premature" because Plaintiffs have not yet established that they have an "enforceable obligation" against Defendant. (Motion, ECF No. 6. at p. 4.)

45. Section 523(c)(1) of the Bankruptcy Code provides, in pertinent part, that

> [T]he debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), (6), or (15) of subsection (a) of this section, unless, *on request of the creditor to whom such debt is owed,* and after notice and a hearing, the court determines such debt to be excepted from discharge [emphasis added] ....

46. The term "creditor" means a person or entity "that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10). The term "debt" is defined as "liability on a claim." 11 U.S.C. § 101(12). A "claim," in turn, is defined as "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A).

47. Based on these statutory definitions and the language of § 523(c)(1), Defendant's argument that Plaintiffs' action is "premature" because "[t]here has not been a determination that the Debtor is liable to the Plaintiffs" (Motion, ECF No. 6. at p. 4) is specious.

48. To the contrary, it has been universally held, including by this Court, that a bankruptcy court can determine whether a debt is non-dischargeable even if it is contingent, disputed, and/or unliquidated. *First Fed. Sav. & Loan Ass'n of Rochester v. Kelley* (*In re Kelley*), 163 B.R. 27, 33 (Bankr. E.D.N.Y.1993) (Since the term "debt" is defined" as "liability on a claim," and "claim" means a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," by definition, "bankruptcy courts may determine whether unliquidated debts are dischargeable"); *accord In re Ranciato*, 638 B.R. 275, 285 (Bankr. D. Conn. 2022) ("A "claim" may also include a cause of action or right to payment that has not yet accrued or become cognizable," citing 2-101 *Collier on Bankruptcy* ¶ 101.05 (16th)); *id* ("A bankruptcy court may determine the dischargeability of an unliquidated debt, or, a cause of action, without liquidating the debt"); *In re Stark,* 06-11966-B-7, 2007 WL 2505563, at *3 (Bankr. E.D. Cal. Aug. 31, 2007) ("Even without the Judgment, this court has jurisdiction to determine the dischargeability of an unliquidated debt."); *In re Stone,* 90 B.R. 71,73 (Bankr. S.D.N.Y. 1988) ("It is axiomatic that in light of the debtor's ability to discharge the plaintiff's claim because it is contingent and unliquidated, regardless of whether a proof of claim is filed, it follows this plaintiff has standing to seek a declaration that this claim is nondischargeable"), *aff'd,* 94 B.R. 298 (S.D.N.Y. 1988), *aff'd,* 880 F.2d 1318 (2d Cir. 1989).

49. Indeed, this Court has expressly held, in circumstances virtually identical to this one, that a creditor who is a shareholder in a closely-held corporation has standing to sue for a

declaration of non-dischargeability on pre-petition unliquidated debts owed to him by another shareholder. *In re Phillips,* 185 B.R. 121, 128 (Bankr. E.D.N.Y. 1995).

50. This makes perfect sense because adopting Defendant's position that liability must be fixed before a bankruptcy court can rule on dischargeability would allow debtors who have been sued for fraud, breach of fiduciary duty and/or willful misconduct to avoid otherwise non-dischargeable claims simply by filing for bankruptcy before a final judgment of liability has been entered.

51. Defendant's argument that this action is premature is especially dubious here given that the deadline for filing an objection to dischargeability was March 8, 2024 and, as stated above, Debtor's counsel refused to extend the deadline. (*See* ¶¶ 38-40, above.)

**Plaintiffs Have Stated a Cognizable Claim Under § 523(a)(2)(A)**

52. Defendant's second argument is that Plaintiffs have failed to state a claim under § 523(a)(2)(A), which precludes a discharge for "an individual debtor from any debt ... for money, property, services, ... obtained by ... false pretenses, a false representation, or actual fraud ...." (Motion, ECF No. 6. at pp. 4-5.)

53. Notably, Defendant's argument is not that Plaintiffs have failed to adequately plead an act of fraud to satisfy the pleading requirements of § 523(a)(2)(A). *See Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355 (2016) (defining the scope of fraudulent conduct covered by § 523(a)(2)(A), and holding that claim against director and shareholder of a closely-held corporation who siphoned off money and left corporation unable to pay its debts was non-dischargeable under § 523(a)(2)(A).)

54. Rather, Defendant's argument is that a claim against a debtor who fraudulently acquires money can only be declared non-dischargeable if the debtor obtains the money directly

from the creditor bringing the claim. (Motion, ECF No. 6. at pp. 4-5.) Stated in terms applicable here, Defendant is arguing that Plaintiffs cannot state a claim because they did not suffer a direct loss arising from Defendant's fraudulent misconduct, but only suffered in indirect (or derivative) loss because Defendant's fraudulent conduct was directed at M&P. (*Id*.)

55. This argument is specious. The language of § 523(2)(A) does not support Defendant's attempt to create an additional pleading requirement, or otherwise limit such claims to creditors who were direct victims of the debtor's fraudulent scheme.

56. Defendant's argument is also directly contradicted by *Husky*. In that case, the Supreme Court sustained a non-dischargeability claim brought by a creditor of a closely-held corporation against a debtor, who was a director and shareholder in that corporation, where the debtor had fraudulently transferred funds from the corporation to another business that he controlled. 578 U.S. at 358 (the debtor "drained" the corporation of "assets it could have used to pay its debts to creditors").

57. The Supreme Court in *Husky* could not have held as it did if § 523(2)(A) required that money "be transferred to the debtor from the creditor" directly to sustain a claim, as Defendant argues here, because, in that case, the creditor's claim was not based on the debtor having fraudulently drained the assets of the creditor, but due to the debtor having fraudulently drained the assets of another company which owed the creditor money.

58. Similarly, in *Cohen v. de la Cruz*, 523 U.S. 213 (1998), the Supreme Court rejected the argument that the debt can only be declared non-dischargeable under § 523(2)(A) to the extent of the "value of the 'money, property, services, or ... credit' the debtor obtained by fraud," and held that a debt can be declared non-dischargeable to the fullest extent that the debt is "traceable" to the debtor's fraudulent scheme. *Id*. at 219-20.

59. Defendant's argument here, which would require Plaintiffs to show that Defendant defrauded them out of money directly, is inconsistent with *Cohen*, which held that all losses traceable to a debtor's fraudulent scheme can be declared non-dischargeable. *Accord In re: Salim*, No. 13-42974-ESS, 2015 WL 1240000, at *28 (Bankr. E.D.N.Y. Mar. 16, 2015) (citing *Cohen* for the principle that "a debt that is nondischargeable under Section 523(a) should include the full amount associated with the conduct at issue"), *aff'd*, 577 B.R. 615 (E.D.N.Y. 2017).

60. Equally important, the cases cited by Defendant in his Motion do not support, or even address, the point that he seeks to make.

61. Defendant relies primarily on *In re Bohn*, No. 13-35854 (RG), 2015 WL 2415412, (Bankr. D.N.J. May 19, 2015) (cited in Motion, ECF No. 6 at p. 5), in which the debtor filed for bankruptcy protection after being sanctioned by a New York court for frivolous conduct and ordered to pay $34,400 in attorneys' fees to the plaintiff. The plaintiff subsequently moved to have the debt declared non-dischargeable under § 523(a)(2)(A).

62. As part of its non-dischargeability analysis, the bankruptcy court observed that, to sustain a claim under § 523(a)(2)(A), it must be alleged that:

> something of value—specifically, money, property, services or an extension, renewal, or refinancing of credit—be transferred to the debtor from the creditor. *Thus, frauds which do not involve the delivery of money, property, services or an extension, renewal, or refinancing of credit are not encompassed by this discharge exception.*

*Id.* at *5 (emphasis in original, quoting *In re Glunk,* 343 B.R. 754, 758 (Bankr. E.D. Pa. 2006).

63. Based on the second sentence in the quotation above, the *Bohn* court held that the plaintiff did not state a cause of action under § 523(a)(2)(A) because there was no allegation that the debtor obtained money, property or services through fraudulent conduct; rather, the claim

was merely that the plaintiff "was forced to incur attorney's fees as the result of debtor's [frivolous] conduct" in the state court action.

64. By contrast, the first sentence in the quotation above, which is the portion of the decision on which Defendant relies in making his argument that the creditor had to suffer a direct loss, is superfluous to the decision. Indeed, the source of the loss was not even an issue in *Bohn* because there were only two parties involved, the creditor and the debtor.

65. Likewise, in *Glunk,* another decision cited by Defendant (Motion, ECF No. 6 at p. 5) as well as by the court in *Bohn*, the issue before the bankruptcy court was whether the money was acquired by fraud, not whether the money was transferred from the creditor to the debtor. *Glunk*. 343 B.R. at 758 (dismissing as legally deficient a § 523(a)(2)(A) claim against a debtor who performed surgery that led to the death of the plaintiff's daughter because the surgery itself did not involve the transfer of any money or property via fraud).

66. The same is true for *In re Holzhueter*, 575 B.R. 444 (Bankr. W.D. Wis. 2017), another case cited by Defendant. (Motion, ECF No. 6, at p. 5.) Once again, the issue before the court was whether the debtor "obtained anything through that fraud." *Id*. at 453. That decision did not address, and does not support, the argument advanced by Defendant here.

67. In addition to Defendant's argument finding no support in the language of the statute, and his legal authority being inapposite, even if the Court were to find some merit in Defendant's argument that a claim under § 523(a)(2)(A) can only be brought by the direct target of the fraudulent scheme, Defendant's argument still fails because M&P, the creditor that Defendant has been accused of defrauding, is a party to this adversary proceeding via the derivative claims made by Plaintiffs on M&P's behalf.

68. Even if this Court disagrees with the analysis above, Defendant's Motion only addresses Plaintiffs' claim under § 523(a)(2), and is not directed at Plaintiffs' other claims, which should be allowed to proceed.

**Plaintiffs Have Adequately Alleged Both Individual and Derivative Claims and Have Standing To Assert Both.**

69. Defendant's final argument on dismissal is two-fold: First, he argues that Plaintiffs lack standing individually to bring claims against Defendant because all the harm alleged in the Complaint arises from acts taken by Defendant in his capacity as the president and majority shareholder of M&P, which are derivative claims. (Motion, ECF No. 6, at p. 7.) Second, he argues that, to the extent Plaintiffs have alleged derivative claims on behalf of M&P, those claims are deficiently pled because Plaintiffs have not made a demand on M&P to bring those claims directly. (Motion, ECF No. 6, at p. 6-7.) Both contentions are meritless.

### Plaintiffs have asserted both individual and derivative claims

70. With respect to the first point, this Court has repeatedly held that, in a case involving a closely-held corporation where ownership of that corporation resides in just a few individuals, any injury to the corporation caused by one owner constitutes a direct injury to the other owners, who can sue for a determination of dischargeability. *In re Beeber*, 239 B.R. 13, 24-25 (Bankr. E.D.N.Y. 1999) (one of two owners of closely-held corporation has "standing on behalf of [the corporation] to object to [the other owner's] discharge as well as seek a determination as to the dischargeability of the debt owed to him"). In reaching this result, the *Beeber* court cited to *Phillips*, *supra*, which held that, where one owner of a closely-held corporation has claims against the other arising from the latter having unjustly enriched himself from the corporation's assets, regardless of how the claim is designated, "the direct injury

threshold is met, [and] the plaintiff has standing as a shareholder" to seek a determination of non-dischargeability under § 523. *Phillips*, 185 B.R. at 127–28.

71. In this case, however, the Court need not even decide whether the underlying claims are individual or derivative claims because, as reflected in the caption of the Complaint, Plaintiffs have commenced this proceeding both "individually as well as and derivatively on behalf of M&P." Since Plaintiffs have alleged both types of claims, the Court need not decide which claims Plaintiffs have standing to assert, since they have asserted both types, and both types are lists on the Debtor's schedule of liabilities.

72. Aside from the claims that Defendant drained the assets of M&P to Plaintiffs' detriment, which may be characterized as both individual and derivative claims under the authorities cited above, Plaintiffs' claim against Defendant to recover their attorneys' fees and expenses under the Sanctions Motion in the Kings Action it is indisputably an individual (direct) claim is indisputably an individual claim.

73. As described in the Complaint, Plaintiffs have alleged that they suffered a direct injury, in the form of unnecessary attorneys' fees and expenses in the Kings Action, as a result of the willful and malicious actions of Defendant and his wife Vera having given knowingly false testimony during the shareholder status hearing in the Kings Action, which was the subject of the now-stayed Sanctions Motion. *See* N.Y.C.R.R., § 130-1.1(c)(3) (defining "frivolous" conduct to include the assertion of "material factual statements that are false").[4]

74. Finally, it is worth mentioning that the Debtor himself has given mixed signals as to whether Plaintiffs' claims are direct and derivative claims. As Defendant has acknowledged (Motion, ECF No. 6 at p. 1), Defendant initially listed Plaintiffs' claims on his schedule of

---

[4] Plaintiffs seek to have the sanctions claim declared non-dischargeable under 11 U.S.C. § 523(A)(6), which covers debts caused by the willful and malicious conduct of the debtor.

liabilities as direct claims, but the day before the Motion was filed, amended his schedules to recharacterize Plaintiffs' claims both individual and derivate claims (Bankruptcy Case No 1-23-44424-nhl, ECF No., 11, pp. 5-6), which is evidence that the Court may consider in deciding the nature of Plaintiffs' claims, if necessary to do so. *See Braunstein v. Massachusetts Bank & Tr. Co.*, 443 F.2d 1281, 1284 (1st Cir. 1971) (schedules filed by the debtor "may not have been dispositive but they were certainly probative evidence.") Since the Debtor himself seems unsure about the nature of Plaintiffs' claim, dismissal based on lack of standing is premature.

**Plaintiffs' have already alleged that a demand on M&P would be futile**

75. As for Defendant's contention that the derivative claims are defective because the Complaint does not contain allegations of a demand on M&P to act (Motion, ECF No. 6, at p. 6-7), Defendant has overlooked the allegations made by Plaintiffs in the Kings Action stating that a demand on M&P to take direct action against Defendant would be futile:

> A Demand on the Corporation Would Have Been Futile
>
> Plaintiffs, individually and jointly, are shareholders in M&P and were shareholders at the time of the misconduct alleged herein.
>
> Prior to commencing this action, Plaintiffs did not make a formal demand on the board of directors of the Corporation to address the misconduct alleged herein, because any such demand would have been futile.
>
> A demand on the board of directors would have been futile because Raziyev is the sole member of the board of directors of the Corporation, and he stands accused of the misconduct alleged herein, which includes charges that Raziyev is paying himself and his wife Vera excessive salaries, that Raziyev is otherwise taking money out of the Corporation for his personal use, and that Raziyev has deprived the shareholders of dividends that reflect the Corporation's profits.

(Exhibit 1 to the Complaint, ECF No. #1-1, at ¶¶ 127-129.)

76. Since the amended complaint in the Kings Action is attached as an exhibit to the Complaint, the Court may consider its contents in deciding this Motion. *DiFolco v. MSNBC*

*Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a [ ] court may consider the facts alleged in the complaint, *documents attached to the complaint as exhibits*, and documents incorporated by reference in the complaint [emphasis added]").

77. Given that nothing has changed with respect to the ownership or control of M&P since Plaintiffs filed their amended complaint in the Kings Action, there is no legal or practical requirement for Plaintiffs to make another, equally futile demand for purposes of this adversary proceeding.[5]

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion to dismiss this adversary proceeding.

DATED: May 9, 2024
           New York, New York

           GREENBERG FREEMAN LLP

           By: /s/ *Michael A. Freeman*
               Michael A. Freeman
               110 East 59th Street, 22nd Floor
               New York, New York 10022
               (212) 838-3121
               freeman@greenbergfreeman.com
               *Attorneys for Plaintiffs*

---

[5] If the Court concludes differently, Plaintiffs seek leave to amend their complaint after making another futile demand.